LARSON, Respondent, vs. TAX COMMISSION and another, Appellants.

*October 10, 1939—January 16, 1940.*

For the appellants there was a brief by the *Attorney General* and *Harold H. Persons,* assistant attorney general, and oral argument by *Mr. Persons.*

*Clarence R. Hicks* of Madison, for the respondent.

The following opinion was filed November 7, 1939:

WICKHEM, J.   This appeal involves a construction of sec. 71.02 (2) (b) 3, Stats. 1929.   This paragraph reads as follows:

"Amounts distributed in liquidation of a corporation shall be treated as payment in exchange for the stock, and the.gain or loss to the distributee resulting from such exchange shall be determined under the provisions of this paragraph and section 71.02 (2) (d).   No amounts received in liquidation shall be taxed as a gain until the distributee shall have received amounts in liquidation in excess of his cost or other income tax basis provided in section 71.02 (2) (d), and any such excess shall be taxed as gain in the year in which received.   Losses upon liquidation shall be recognized only in the year in which the corporation shall have made its final distribution. *For the purposes of this paragraph a corporation shall be considered to be liquidating when it begins to dispose of the assets with which it carried on the business for which it was organized and begins to distribute the proceeds from the disposition of such assets, or the assets themselves, whether or not such disposition and distribution is made pursuant to resolution for dissolution;* provided, that any distribution of current earnings of a corporation shall not be considered to be a distribution in liquidation unless the corporation making such distribution has ceased or is about to cease carrying on the business for which it was organized."

The issue presented upon this appeal is whether a one hundred per cent dividend received by the taxpayer in 1931 upon his stock in the Stoughton Lumber & Supply Company, a Wisconsin corporation (hereinafter called the "corporation"), which he admits was a liquidating dividend, constituted taxable income for the year 1931.   This issue in turn is resolved by a determination of the character of a prior one hundred per cent dividend received by him in 1929 upon the same stock.   If the prior dividend was a liquidating dividend, then the taxpayer had had returned to him the full cost of his stock, and the 1931 dividend constituted a gain under the provisions of sec. 71.02 (2) (b) 3, Stats.

The assessor of incomes and the Tax Commission took the position that the 1929 dividend was liquidating in character, while the county income tax board of review and the circuit court held that it was a regular dividend and exempt under the provisions of sec. 71.04, Stats., which permits as a deduction of income of persons other than corporations,—

"(4) Dividends, except those provided in section 71.02 (2) (b) 2 and 3, received from any corporation conforming to all of the requirements of this subsection. . . ."

It will be convenient before attempting a construction of the act to consider the facts in this case. Prior to 1929, the corporation owned two retail lumberyards, one at Stoughton and the other at Monroe. Its business consisted exclusively of operating these yards. It had an authorized capital stock of $50,000, made up of five hundred shares of the par value of $100 each. All of these shares were issued and outstanding. The taxpayer owned one hundred shares, for which he had paid the sum of $10,000. During the eight years of its existence, prior to 1929, the corporation had paid dividends each year and had invested in inventory and equipment such portion of its earnings as was not paid out in dividends. As of December 31, 1928, its surplus attributable to earnings was $54,567.84. On that date it had on hand only $192.57 cash. On December 18, 1928, C. M. Larson, president, general manager and principal stockholder of the corporation in personal charge of the Stoughton yard, was accidentally killed. On December 21st, the day following his funeral, a meeting of the stockholders was held. New officers were elected and authority vested in them to negotiate the sale of the Monroe yard. On January 26, 1929, the taxpayer and other stockholders entered into a written agreement with the corporation for the purchase of the Monroe yard, exclusive of accounts receivable, at a price to be later computed in accordance with the inventory. The contract did not require the taxpayer and his associate to pay cash, but in accordance with the contract they delivered a joint promissory note to

the corporation payable in six months, and agreed that any dividends on their stock in the company be applied as payment for this yard. The contract contained this recitation:

"The parties hereto now have in contemplation the fact that first party [the corporation] may within the next one or two years conclude to dissolve and liquidate altogether."

This is followed by provisions substantially to the effect that, if such dissolution has commenced but has not proceeded to the point where the liquidating dividend will be available to the second parties as an offset, they are to have an extension of time on their notes. On February 9, 1929, a stockholders' meeting was held which, (1) declared a one hundred per cent cash dividend. This is the dividend the nature of which is in question here. In connection with the voting of this dividend, it was resolved that, "Whereas, it is apparent that such dividend cannot be paid immediately and that a reasonable time at least would be required for the corporation to convert sufficient of its receivables and other property into money for that purpose," promissory notes of the corporation should be issued to the respective stockholders "for a sum equal to the dividend each stockholder is thus entitled to receive, less any liability owing by any stockholder to the corporation, whether due or not." (2) It approved the sale of the Monroe yard theretofore negotiated. (3) It delegated two stockholders, one of them the taxpayer, "to negotiate and make the sale of the Stoughton yard." This latter action included the fixing of a purchase price for the Stoughton yard. On February 12, 1929, the Stoughton yard was sold to two stockholders of the corporation and a written contract of sale entered into on that date. No stockholders' meeting was held to approve this sale, but on February 13, 1929, the stockholders executed a written ratification. This contract contained the following recitation:

"The parties hereto now have in contemplation the fact that first party may within the next one or two years conclude to dissolve and liquidate altogether."

This recitation was followed by provisions to the effect that if the dissolution shall not have been completed or made effective "to the extent that the liquidating dividend can be paid to the stockholders by the time the aforesaid note falls due" an extension of the note may be given. Pursuant to the declaration of the one hundred per cent dividend, notes of the corporation were issued to the stockholders. The taxpayer received the corporation's note for $10,000, and this was then canceled and credit given therefor on the purchase-money note taxpayer had given upon purchasing the Monroe yard. A further dividend of one hundred per cent was declared and paid to the stockholders October 13, 1931. This is conceded to have been a liquidating dividend, and is the dividend here sought to be taxed. If the dividend of February 9, 1929, was a liquidating dividend, it operated to return to taxpayer the full cost of his stock, and the second liquidating dividend was a profit or gain. If, on the other hand, the earlier dividend was a regular dividend, then the 1931 dividend, being the first return of investment, would represent no gain. The question presented requires both a construction of the statute and a consideration of the inferences properly to be drawn from the facts.

It will be convenient first to consider the proper construction of the statute. Prior to the enactment in 1927 of the pertinent portions of sec. 71.02, Stats., such a dividend as is here involved would have been treated as an ordinary or regular dividend upon the stock. *Falk v. Tax Comm.* 218 Wis. 130, 259 N. W. 624; *Hope Investment Co. v. Tax Comm.* 218 Wis. 140, 259 N. W. 628. It was the evident purpose of the statute to change this situation.

Paragraph 3 of sub. (2) (b) of sec. 71.02, Stats., begins with the statement that amounts distributed in liquidation of a corporation shall be treated as payment in exchange for stock, and a gain, if any, computed, determined, and taxed after the distributee shall have received amounts in liquidation in excess of his cost or other income tax basis provided

elsewhere in the section. The paragraph then sets forth the circumstances under which a corporation shall be deemed to be liquidating. A corporation is said to be liquidating "when it begins to dispose of the assets with which it carried on the business for which it was organized and begins to distribute the proceeds from the disposition of such assets, or the assets themselves," whether pursuant to resolution for dissolution or not. There follows a proviso that distribution of current earnings shall not be considered liquidating dividends unless the corporation has ceased or is about to cease the business for which it was organized. This proviso has no materiality here.

The statute leaves much to be desired in the direction of clarity. The only matter expressly dealt with is the time at which liquidation is to be deemed to have commenced. It is not provided that this must be in pursuance of a plan to liquidate, or that it must be followed by liquidation, but we conclude that at least the first and probably the second are added requisites. It cannot be that a mere disposition of operating assets and a distribution of the proceeds constitutes a liquidating operation if ultimate liquidation is not contemplated. It is the evident intent of the legislature that when a corporation has liquidated or is liquidating, as that term is commonly understood, the beginning of that process will be taken for the purpose of determining taxability of dividends to be the time when in pursuance of its plans to liquidate, although without formal resolution of dissolution, it begins to dispose of operating assets and to distribute the proceeds or the assets themselves to the stockholders. From this it follows that where there is no formal resolution for dissolution, it is a question of fact in each case whether a corporation at the time when it first disposed of operating assets and distributed the proceeds did so in accordance with a purpose ultimately to liquidate. This being true, it is necessary to consider the facts of this case.

The sequence of events in this case strikes us as pointing inevitably to the existence of a plan and purpose to liquidate the corporation. As heretofore pointed out, within three days after the death of its president, general manager and principal stockholder, the stockholders' meeting authorized negotiations for the sale of one of the two yards operated by the company. This sale was made hardly more than a month thereafter, and the contract of sale recited that there may shortly be a dissolution and liquidation, and provided for that contingency. On February 9, 1929, about seven weeks after the death of the president, the one hundred per cent cash dividend was declared. It was recited that since there was no cash on hand to meet the dividend, promissory notes would be given against which could be offset any liability owed by stockholders of the corporation. The sale of the Monroe yard was ratified, and authority was voted to sell the only remaining operating asset—the Stoughton yard. Within three days thereafter, the contract of sale for the Stoughton yard was entered into, the purchasers of this yard as well as the other yard being stockholders. The contract for the sale of the Stoughton yard, like that disposing of the Monroe yard, refers to and provides for the contingency of dissolution. The cash dividend was used as an offset against purchase price in the case of both sales, so that in effect the stockholders who purchased these two yards were given full credit against the purchase for so much of the value of the assets as represented a reinvestment of the surplus of the company. This offset was plainly contemplated by the resolution voting the so-called cash dividend.

It is difficult for us to see how the corporation could more clearly evidence its purpose to liquidate short of an express resolution of dissolution. It was engaged exclusively in the business of operating these two yards. It proposed to engage in no new business and to dispose of all of the assets used in its business and distribute the proceeds. The death

of its president, manager and principal stockholder, was evidently of great significance, because within a few days of his death a process was commenced which in less than two months resulted in the disposition of all the corporation's operating assets to its stockholders under arrangements contemplating the use of dividends, whether liquidating or nominally regular in character, in discharging the purchase price. When the one hundred per cent cash dividend was declared on February 9, 1929, the corporation had begun to liquidate because in accordance with a plan for ultimate liquidation it had disposed of operating assets and begun to distribute the proceeds. It is true that the one hundred per cent cash dividend did not deplete the company's surplus or impair its capital. It is likewise true that the sale of the Monroe yard at a price of $31,000 did not exhaust the surplus of $54,000. But we think that these are not material considerations under the statute. The plan or purpose to liquidate being found, the process of liquidation begins when the operating assets are disposed of and the proceeds or the assets distributed to the stockholders, whether such dispositions do or do not impair the capital of the corporation.

The foregoing reasons require reversal of the judgment.

*By the Court.*—Judgment reversed, and cause remanded with directions to affirm the order and assessment of the Tax Commission.

A motion for a rehearing was denied, without costs, on January 16, 1940.